UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                        :
TOMMY G. MORGAN,                        :        CASE NO. 1:05-CV-2872
                                        :
              Plaintiff,                :        JUDGE JAMES S. GWIN
                                        :
vs.                                     :        OPINION AND ORDER
                                        :        [Resolving Docs. 149, 151]
NEW YORK LIFE INSURANCE                 :
COMPANY                                 :
                                        :
              Defendant.                :
                                        :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On December 13, 2005, Defendant removed Plaintiff Tommy Morgan's state-filed Complaint to federal court. [Doc. 1.] Plaintiff's Complaint alleged four causes of action: (1) age discrimination; (2) gender discrimination; (3) race discrimination; and (4) defamation. On August 30, 2006, the Court granted Defendant New York Life Insurance Company's Motion for Summary Judgment with regard to Plaintiff's claims of sex discrimination and defamation, but denied Defendant's Motion for Summary Judgment with regard to Plaintiff's claims of age and race discrimination. [Doc. 65.]

On September 28, 2006, a jury rendered a verdict in favor of Plaintiff on his claim of age discrimination and awarded Plaintiff $6,000,000 in compensatory damages and $10,000,000 in

1

Case No. 1:05-CV-2872
Gwin, J.

punitive damages, as well as attorneys' fees.  [Doc. 135.]  The jury rendered a verdict in favor of

Defendant on Plaintiff Morgan's claim of race discrimination.  *Id.*  On October 3, 2006, the Court

entered a judgment in accordance with the jury verdict.  [Doc. 137.]  Likewise, on October 3, 2006,

the Court denied Defendant's Motion for a Directed Verdict on the issue of punitive damages.  [Doc.

138.]

On October 18, 2006, Defendant filed a Motion for Judgment as a Matter of Law.  [Doc.

149.]  On October 19, 2006, Defendant filed a Motion for New Trial and in the alternative a Motion

for Remittitur.  [Doc. 151.]  On February 27, 2007, Plaintiff opposed each of these motions.  [Doc.

172.]

For the following reasons, the Court hereby **DENIES** Defendant's Motion for Judgment as

a Matter of Law, Motion for New Trial and Motion for Remittitur.

## I.  Background

Plaintiff was born on April 21, 1954.  He began working for Defendant near August 2, 1986.

In January 2000, Defendant promoted Plaintiff to Managing Partner of its Northern Ohio General

Office, located in Cuyahoga County.  The Northern Ohio office was one of two "tier one" offices

in the company's South Central Zone.  Over the next five years, Plaintiff earned between $503,738

and $839,170 in annual income.  Plaintiff maintained this position until Defendant informed Plaintiff

on October 26, 2005 that it was terminating his employment effective September 30, 2005.

Defendant then appointed Mostafa Abdou, a 40-year-old man of Egyptian descent, to succeed

Plaintiff as Managing Partner of the Northern Ohio Office.

Throughout Plaintiff's tenure as Managing Partner of the Northern Ohio Office, Bob O'Neill

2

Case No. 1:05-CV-2872
Gwin, J.

served as the South Central Zone's Chief Operating Officer.  Paul Morris served as Senior Vice

President of the South Central Zone until December 2003.  In January 2004, Morris was promoted

to Senior Vice President of Agency.  At this time, Brad Willson was named  Senior Vice President

of the South Central Zone.  Phil Hildebrand served as Defendant's Executive Vice President and

Morris's direct supervisor throughout Plaintiff's tenure as Managing Partner.  While employed as

Managing Partner of the Northern Ohio office, Plaintiff reported to Morris, Willson and O'Neill.

Plaintiff offered direct and circumstantial evidence to support his claim of age

discrimination.  As direct evidence, Plaintiff offered numerous statements by Morris, O'Neill,

Willson and Hildebrand that allegedly reflect age bias in favor of younger workers.  Plaintiff also

presented a prima facie case of indirect discrimination by showing that he is a member of a

statutorily protected class who was arguably qualified for his position, terminated by his employer

and replaced by a person who is not a member of the protected class.

At trial, Defendant responded that the statements offered as direct evidence by Plaintiff do

not reflect age bias and share no nexus with Plaintiff's discharge.  Additionally, Defendant offered

evidence of a business justification for Plaintiff's termination.  Defendant argued that Plaintiff

Morgan was expected to expand the Northern Ohio office, but production actually declined

significantly under Plaintiff's management.  The Defendant says that Plaintiff Morgan failed to meet

targets after the Defendant placed Plaintiff on "performance warning" and subsequently "final

warning."  Although Plaintiff initially appeared to meet each of six performance goals necessary to

avoid termination, Defendant later determined that Plaintiff received credit for four improper

commission splits.  As a result, Defendant New York Life argued to the jury that Plaintiff failed to

3

Case No. 1:05-CV-2872
Gwin, J.

meet one of the required benchmarks for minimum performance and Defendant opted to terminate

Plaintiff's employment with the company.

Plaintiff responded to the jury with regard to Defendant's proffered business justification for

his termination and claimed that the rationale offered by Defendant was merely a pretext for

discrimination. In seeking to show that New York Life's justification was pretextual, Plaintiff

offered evidence that he received the highest possible overall performance ranking in each of his

first four years as Managing Partner of the Northern Ohio office. Likewise, Plaintiff noted to the

jury that instead of placing Plaintiff on a less-serious "performance alert" when his office's Growth

Profitability and Accountability measure ("GPA") allegedly fell below the company's 1.50

minimum benchmark, Defendant skipped this initial measure and immediately placed Plaintiff on

"performance warning," the second of three disciplinary designations. In addition, Plaintiff offered

evidence that his GPA never fell below 1.71; that Defendant mistakenly understated his office's

overall performance; and that Defendant refused to correct its error when notified. Plaintiff also

argued to the jury that Defendant treated younger workers more favorably though their performance

was demonstrably worse than Plaintiff's. Finally, Plaintiff noted that although he unquestionably

met five out of six performance goals after being placed on "final warning," and although he only

arguably failed to reach his final goal of increasing office manpower by a single employee, Plaintiff

was terminated and replaced by a younger, less-qualified candidate.

## II. Legal Standard

"On a motion for a judgment notwithstanding the verdict or for a directed verdict, the district

court must determine whether there was sufficient evidence presented to raise a material issue of fact

4

Case No. 1:05-CV-2872
Gwin, J.

for the jury." *Monette v. AM-7-7 Baking Co.*, 929 F.2d 276, 280 (6th Cir. 1991). The Court "must view the evidence in the light most favorable to the party against whom the motion is made, and give that party the benefit of all reasonable inferences." *Wayne v. Village of Sebring*, 36 F.3d 517, 525 (6th Cir. 1994). "'[S]ufficient evidence' will be found unless, when viewed in the light of those inferences most favorable to the nonmovant, there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable persons could differ." *Monette*, 929 F.2d at 280; *see also Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005) ("Judgment as a matter of law may only be granted if . . . there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party.").

With regard to discrimination, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 508 n.17 (1957)). Finally, "[t]he factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

Fed. R. Civ. P. 59(a) dictates that "[a] new trial may be granted . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."

> Generally courts have interpreted this language to mean that a new trial is warranted when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive;

Case No. 1:05-CV-2872
Gwin, J.

>           or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings
>           being influenced by prejudice or bias.

*Holmes v. City of Massillon*, 78 F. 3d 1041, 1045-46 (6th Cir. 1996).

When ruling on a motion for new trial based on the ground that the verdict was rendered against the weight of the evidence, "the trial court must compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence." *J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991). Nevertheless, "the trial court should deny such a motion if the verdict is one that reasonably could be reached, regardless of whether the trial judge might have reached a different conclusion were he the trier of fact." *Wayne*, 36 F.3d at 525; *see also J.C. Wyckoff*, 936 F.2d at 1487 (holding the Court should deny a motion for new trial "if the verdict is one which could reasonably have been reached, and the verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable").

### III. Analysis of Motion for Judgment as a Matter of Law

Defendant's Motion for Judgment as a Matter of Law contains two primary contentions: (1) Plaintiff failed to prove that his discharge was motivated by his age; and (2) Defendant is entitled to judgment as a matter of law on Plaintiff's claim for punitive damages. The Court rejects both of these arguments.

A. Failure to Prove Age Discrimination

Plaintiff Morgan sued New York Life for wrongful termination under Ohio R.C. Chapter 4112. He claimed that New York Life illegally discriminated on the basis of age. Morgan gave both

6

Case No. 1:05-CV-2872
Gwin, J.

direct and circumstantial evidence that, he contended, established New York Life's motive to

discriminate.   In seeking to establish Defendant's intent to discriminate on account of age through

circumstantial evidence, Morgan claimed that he was qualified for his position, that New York Life

fired and then replaced him with Mostafa Abdou, a 40-year-old who was substantially younger.  See

*Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 180 (2004) ("[W]e hold that absent direct

evidence of age discrimination, in order to establish a prima facie case of a violation of R.C.

4112.14(A) in an employment discharge action, a plaintiff-employee must demonstrate that he or

she (1) was a member of the statutorily protected class, (2) was discharged, (3) was qualified for the

position, and (4) was replaced by, or the discharge permitted the retention of, a person of

substantially younger age.")

    Here, New York Life did not offer any significant evidence challenging Morgan's prima

facie case.  *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 571 (6th Cir. 2006) ("For purposes

of the prima facie analysis, a plaintiff's qualifications are to be assessed in terms of whether he or

she was meeting the employer's expectations prior to and independent of the events that led to the

adverse action."); *Cline v. Catholic Diocesan Sch. of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 1999)

(When assessing whether a plaintiff has met her employer's legitimate expectations at the prima

facie stage of a termination case, "a court must examine plaintiff's evidence independent of the

nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff."). Instead,

New York Life said that it had offered a nondiscriminatory justification for firing Morgan and that

Morgan had failed to establish that its justification was pretextual.  See *Texas Dept. of Community*

*Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  As would be expected, Morgan disagreed, saying that

Case No. 1:05-CV-2872
Gwin, J.

he had established that New York Life's justification was pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973 ); *Burdine*, 450 U.S. at 253.

Alternative to Plaintiff Morgan's argument that he had established New York Life's discriminatory intent through circumstantial evidence, Morgan argued that he had also established this intent through direct evidence.  Responding, Defendant New York Life said any arguably discriminatory statements were unrelated to Morgan's firing and were not sufficiently temporal to his firing to establish a discriminatory intent.

A.      *Failure to Prove Age Discrimination*

At trial, Plaintiff Morgan offered alternative evidence to support his claim that New York Life discriminatorily fired him on account of his age.  He offered circumstantial evidence under the *McDonnell Douglas* framework and he separately produced direct evidence that he claimed showed an intent to discriminate.  Defendant presents three arguments to support its claim that no reasonable juror could determine that Plaintiff's discharge was motivated by age animus: (1) the Plaintiff failed to prove that similarly situated younger employees were treated more favorably; (2) the evidence of Plaintiff's poor performance was undisputed, and (3) the statements offered by Plaintiff as direct evidence of age animus are not sufficiently probative of age discrimination.

1 .  Treatment of Similarly Situated Younger Employees

Defendant argued to the jury that Plaintiff failed to show that similarly situated younger employees were treated more favorably.  Responding, Plaintiff says it offered ample evidence that

Case No. 1:05-CV-2872
Gwin, J.

Defendant treated preferentially younger managing partners while holding older managing partners, including himself, to higher performance standards.

The parties both gave evidence that the GPA measurement was the broadest and most replied-upon measurement of manager performance. In June 2004, Defendant New York Life originally said Plaintiff's GPA was 1.5. After Morgan questioned this, New York Life acknowledged that Plaintiff's actual GPA was 1.71. Plaintiff also emphasizes that Plaintiff's year-end GPA was at or above 2.0 from 2000 until Plaintiff was terminated in 2005. Further, in June 2004, Defendant did not follow its usual practice of first giving a "performance alert" and instead placed Plaintiff on "performance warning."

In contrast to the treatment given Morgan, South Central Zone Chief Operating Officer O'Neill testified that Plaintiff's replacement, Mostafa Abdou, received GPA scores of 1.71 and 1.93 in 2004 and 2005, but Defendant never placed him on "performance warning." Additionally, Plaintiff offered evidence that between March and May 2005, Abdou received GPA scores of 1.00, 0.93 and 1.07, without repercussions. Joint Ex. VIII. Finally, Willson wrote that Abdou could not "grow the Office and take it to the next level," when conducting a review of Abdou's tier-two Orlando office in 2004. Pl. Ex. 168-018. Nevertheless, Abdou was promoted to replace Plaintiff as Managing Partner of the larger tier-one Northern Ohio office. Repeating, Morgan gave evidence that New York Life replaced him with significantly younger Abdou though Abdou had lower year-end GPA scores in the smaller Orlando, Florida office, an office that, unlike Cleveland, was in a fast-growing metropolitan area. One can scarcely imagine a more similarly situated comparator. With nothing other than age to explain why Defendant New York Life would replace a higher rated

9

Case No. 1:05-CV-2872
Gwin, J.

manager with a lower rated manager from a smaller office, the jury could infer that age motivated

Morgan's discharge.

Plaintiff also presents numerous other examples of younger managing partners who received

preferential treatment.  South Central Zone Senior Vice President Willson testified that Defendant's

managing partners are not eligible for promotion if they have a GPA under 1.5.  Nevertheless,

Willson testified that although Randy Cox (age 39) was ranked 66 out of 69 managing partners in

the South Central Zone with a GPA of 1.22 in June 2004, Defendant promoted him upon Willson's

recommendation.  Trial Tr. 497-99.

Likewise, in June 2001, Ken Savoie, a substantially younger managing partner, received an

overall GPA of 0.57.  After a new manager adjustment, Savoie's final adjusted GPA was 1.57.  Pl.

Ex. 198-040.  Defendant New York Life did not place Savoie on "performance warning," however.

Instead, South Central Zone Chief Operating Officer O'Neill testified that  Defendant brought him

in for younger managing partner training.  Importantly and in direct contrast to the treatment given

Plaintiff Morgan, in February 2005, Defendant placed Savoie on "final warning" and established

a list of performance objectives, requiriting Savoie to meet them to avoid firing.  Though Savoie

failed to meet many objectives, Defendant did not terminate his employment.  In contrast, Plaintiff

Morgan received a performance warning though his GPA was 1.71, and defendant then fired him

when he achieved five of six performance goals.

When Jeff Slattery, a substantially younger managing partner than Plaintiff, received an

adjusted GPA of 1.25, Senior Vice President of Agency Morris described him as a "great young

talent," and determined that Slattery was simply experiencing a down year and did not place him

Case No. 1:05-CV-2872
Gwin, J.

on performance alert or warning.  Pl. Ex. 202-028-29.  Similarly, South Central Zone Chief Operating Officer O'Neill testified that when John Bravata (age 37) received GPA scores of 1.57 and 1.07, Defendant placed him on "performance alert" a lesser sanction than the "performance warning" that was given to Plaintiff.

Defendant attempted to rebut these examples by stating that the managing partners identified by Plaintiff each had redeeming factors, such as patterns of overall growth in new organization or manpower, that justified the lack of disciplinary measures in their cases.  In those cases, Defendant claimed that extenuating circumstances beyond the control of the managing partner led to low GPAs that failed to accurately represent their true performance.  For example, Plaintiff citeed Amelia Scott (age 36) who earned a GPA of 1.50 in June 2005, who was never placed on "performance alert" and was later promoted.  Defendant noteed that Scott received substantially higher GPAs in both December 2004 and December 2005 and was on maternity leave during the interim.

Whereas Scott's maternity leave reasonably justifieed her mid-year decline in performance, Plaintiff emphasizeed that New York Life gave no consideration to extenuating circumstances that had a negatively impact on the performance of the Northern Ohio office.  For instance, the Cleveland Office unexpectedly lost one of its top producers to disability.  Zone Chief Operating Officer O'Neill testified that the loss of Weinberger, one of the company's top agents, to disability leave, substantially reduced the amount of first year commissions in the Northern Ohio office.  Trial Tr. 280-81.  Likewise, another Northern Ohio employee, John Tijanich, embezzled millions of dollars worth of New York Life client funds in a highly publicized scandal.  New York Life stipulated that Plaintiff's supervision of Tijanich was without fault.  In contrast to Scott, New York Life did not

11

Case No. 1:05-CV-2872
Gwin, J.

take these circumstances, beyond Morgan's control, into account when it evaluated Plaintiff's

performance or put him on "performance warning" and eventually terminated him.

Plaintiff also showed examples of older managing partners who were not extended the same

leeway as Defendant gave their younger counterparts.  Zone Chief Operating Officer O'Neill

testified that in December 2004, Defendant New York Life placed Don Helms, a managing partner

over the age of 50, on "performance alert," even though his GPA was 2.07.  Similarly, Plaintiff notes

that Senior Vice President of Agency Morris praised Willson for "helping MP Bartlett come to a

retirement decision."  Finally, managing partner James Torell (age 64) testified that Defendant

forced him to retire, even though he had never spoken with Defendant about his retirement plans,

had no desire to retire, and remained exuberant about working as a manager in life insurance.  Trial

Tr. 381-82.  Plaintiff notes that Agency Vice President Morris described Torell's previous three

years as the "best of his career,"  yet New York Life gave Torell no choice but retirement because

Defendant believed Torell was not a "manager for the future" and that "time has passed Jim by."

Pl. Ex. 92.

Given the voluminous evidence presented by Plaintiff, the Court rejects Defendant's

contention that Plaintiff failed to give the jury evidence to create a genuine issue of material fact as

to whether defendant treated similarly-situated younger employees more favorably.  As chronicled

above, Plaintiff offered ample evidence that younger managing partners received preferential

treatment, while defendant required older managing partners to meet higher performance standards.

2.  Plaintiff's Job Performance

Defendant New York Life argued to the jury that it fired Plaintiff Morgan for non-

12

Case No. 1:05-CV-2872
Gwin, J.

discriminatory reasons.  It told the jury that it promoted Plaintiff to Managing Partner to grow the

Northern Ohio Office, yet that Office's production declined after the first year of Plaintiff's

leadership.  Defendant argued to the jury that "by the summer of 2005, Morgan's office had declined

from a manpower total of more than 120 agents to less than 100 and that first-year commissions

experienced a similar decline."  Defendant also said that under Plaintiff's supervision the Northern

Ohio office's "second line" management team had decreased from six productive recruiters to three,

two of whom were placed on performance warning.  Likewise, Defendant New York Life said that

two-thirds of the experienced agents in Plaintiff's office left during Plaintiff's tenure.  Finally,

Defendant contended that only one of the 44 agents recruited by Plaintiff in 2001 was even

minimally productive two years later.  New York Life said these purported failures, not age

discrimination, caused it to fire Morgan.

In response to Plaintiff's allegedly declining performance, the Defendant explained it placed

Plaintiff on "performance warning" and subsequently "final warning."  Defendant told the jury that

it established six minimum performance goals and required Plaintiff to meet them to avoid

termination.[1]  Although Morgan met five of the six targets, New York Life said it fired him because

he failed to grow the Office manpower numbers sufficiently.  Defendant New York Life argued to

_____

[1] Defendant established the following six minimum performance requirements for Plaintiff to avoid termination
while on "final warning:"
• Progress and assessment to date on second-line management plan;
• Partners Hitch and Barnes at 70% of standard and no less than -2 on their manpower.  If not, they should be
transitioned out;
• Review of Senior Partner Rusty Garber against his plan and resolutions if appropriate;
• 5% growth in New Organization production;
• 5% growth in total production; and
• 5% growth in Manpower (i.e., 99 regular agents).

13

Case No. 1:05-CV-2872
Gwin, J.

the jury that instead of exceeding his manpower goal by three agents with a total of 102, Plaintiff

actually missed his goal by one agent with a proper total of 98 agents.  Saying that the Plaintiff

failed to meet one of the six performance goals that it had given him, Defendant told the jury that

it "had no alternative but to discharge him for failure to meet the numerical goals of his final notice."

Plaintiff responded to the jury that he consistently met and exceeded Defendant's

performance expectations throughout his tenure as Managing Partner of the Northern Ohio office.

Plaintiff offered evidence that he received the highest possible overall performance ranking in each

of his first four years as Managing Partner.  In further support of this contention, Plaintiff provided

evidence that New York Life gave managers notice of an expected income if those managers met

performance criteria established for each manager.  Morgan says that over the four-year period from

2000 to 2003, his actual income exceeded the income that New York Life told him he could expect

if he met all his performance criteria by more than $550,000.  Jt. Exh. XXXV.  Plaintiff said that this

suggested that he had exceeded New York Life expectations.

Plaintiff presented evidence that among a number of statistical evaluation tools, New York

Life most relied upon a manager's GPA score, a score that was intended to best grade a manager's

overall performance.  The GPA provided New York Life's most used and important measurement

of management.  It measures manager results against company standards in seven separate

categories.[2]  New York Life Senior Vice President of Agency Morris stated that a managing

partner's GPA "is a tool that was used to measure what we consider to be the primary drivers and

---

[2] The seven measured categories are: "(1) Actual Results v. Annual Plan; (2) New Org. FYC Growth; (3) Life
Production Growth; (4) Paid Life Vase Growth; (5) Manpower Growth; (6) Average Appointments Per Recruiter; and
(7) Retention."  Pl. Ex. 68.

14

Case No. 1:05-CV-2872
Gwin, J.

the primary things that happen in an agency."

New York Life grades managers quarterly and yearly using a 4.0 GPA standard.  Under New York Life rules, if a manager falls *below* 1.5, he is subject to a progressive performance plan. Plaintiff highlighted to the jury that his year-end GPA was at or above 2.0 from 2000 until Plaintiff was terminated in 2005.  New York Life responded, however, that while his year-end GPA was at or above 2.0, his second quarter 2004 GPA fell to 1.5.  Seemingly in conflict with its own management practices, the Defendant skipped the "performance alert" stage of its Performance Improvement Program and placed Plaintiff on "performance warning."

Plaintiff Morgan showed the jury undisputed evidence that Defendant New York Life improperly calculated Plaintiff's GPA for June 2004.  Plaintiff's proper GPA for June 2004 was actually 1.71.  As such, Plaintiff emphasized to the jury that at no point during his tenure as Managing Partner of the Northern Ohio office did his GPA decline to a level that would have triggered mandatory placement or even the first stage the company's Performance Improvement Program, "performance alert."  Plaintiff also presented evidence that Defendant failed to correct its computational error when notified.

Plaintiff presented further evidence that Defendant improperly understated his overall performance by using a four-year history when calculating his combined annual growth rate ("CAGR").  New York Life Executive Willson agreed, testifying that New York Life traditionally used a five-year CAGR, not the four-year CAGR used with Morgan.  Morgan argued that the use of the four-year CAGR was significant because it measured his office growth rate against 2000, the best ever year for Northern Ohio, rather than the 1999 base, a base that was much lower and would

15

Case No. 1:05-CV-2872
Gwin, J.

give a much higher five-year CAGR.  As a result of New York Life' using the four-year CAGR,

Morgan argued that he did not receive proper credit for the substantial growth that took place during

his first year as Managing Partner of the Northern Ohio office.

Regarding other performance measurements, Plaintiff presented evidence that he exceeded

Defendant's stated goals for new organization development.  At the time of his termination, Plaintiff

ranked third out of the company's 43 managing partners in this performance category.  Likewise,

in May 2004, the month immediately prior to Plaintiff's placement on "performance warning,"

Plaintiff's office was ranked first out of 41 offices in the South Central Zone in total weighted first-

year commissions, an important New York Life measure.  In June 2004, when Plaintiff was placed

on "performance warning," his office was ranked second out of 41 offices in this performance

category.

With regard to the six minimum performance goals that Defendant New York Life required

Plaintiff to meet when it placed him on "final warning," Defendant conceded that Plaintiff met each

of the first five requirements.  Defendant, however, argued to the jury that Plaintiff's alleged failure

to meet the sixth "Manpower" goal by one agent warranted termination.  Although Plaintiff initially

appeared to meet this sixth requirement, Defendant said it later determined that Plaintiff should not

receive credit for a sales employee who qualified to be counted after receiving four allegedly

improper commission splits.  In these commission splits, another employee agrees to take lower

income and shares credit for the commission with the sales trainee.  In responding to the jury to this

argument, Plaintiff Morgan said that it would be illogical for an established salesperson to agree to

an improper split as, in effect, it would be giving away money to which the established sales person

16

Case No. 1:05-CV-2872
Gwin, J.

was otherwise entitled.

Plaintiff Morgan gave the jury evidence that he met this manpower criteria.  John Mackie, Administrative Officer for the Northern Ohio office testified that the commission splits were approved, and numerous employees of Defendant were aware of the commission splits that resulted in Morgan meeting his manpower goal and no one said that any of the commission splits violated company policy.  Additionally, South Central Zone Chief Operating Officer O'Neill testified that he became aware of the alleged impropriety of the commission splits in July 2005.  On August 19, 2005, however, O'Neill sent Chris Tebeau, Defendant's Chief Vice President for Agency Standards, a memorandum confirming that he had reviewed all of Plaintiff's commission switches and Plaintiff had met his manpower targets.  With this evidence, the Plaintiff contended that the commission switches issue was pretextual and was fabricated to justify a discriminatory decision to terminate Plaintiff's employment.

Plaintiff also provided the jury with further evidence suggesting that New York Life had already decided to fire Morgan before any issue regarding improper commission splits arose.  The Plaintiff offered a promotability index prepared by Defendant entitled, "Managing Partner Selection Process," that lists candidates for Managing Partner of the Northern Ohio position. Pl. Ex. 13.  This document contains the notation, "Update of 09/02/05."  Plaintiff contended to the jury that this document establishes that Defendant had selected Abdou to replace Plaintiff as of September 2, 2005 a date before New York Life decided Morgan had missed any manpower requirement.  Plaintiff suggested the document represents further evidence that improper commission splits was merely a cover for Defendant's discriminatory actions.

17

Case No. 1:05-CV-2872
Gwin, J.

Defendant New York Life disputed plaintiff's argument that Defendant had decided to terminate him before it knew of the employment target issue.  Linda Freundlich, Defendant's Corporate Vice President of Performance Analysis and Recognition attempted to rebut this point, testifying that only the continuously-updated Master List was created as of September 2, 2005.  She stated that the remainder of the "Managing Partner Selection Process" document was not created until September 21, 2005, after Defendant New York Life asked Plaintiff to resign.  Still, the jury received evidence that, if believed, supported a finding that New York Life decided to fire Morgan before the employment target ever became an issue.

In determining whether Defendant's articulated non-discriminatory business reasons for its employment action are merely a pretext for discrimination, Defendant argues that the fact-finder may not "focus on the soundness of an employer's business judgment." *Chappell v. GTE Products Corp.*, 803 F.2d 261, 266 (6th Cir. 1986).  Yet, the Sixth Circuit has held that "[a]lthough it is true that a factfinder should refrain from probing an employer's business judgment, a decision to terminate an employee based upon unlawful considerations does not become legitimate because it can be characterized as a business decision." *EEOC v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 835.

To succeed on its Motion for Judgment as a Matter of Law in the instant case, Defendant must demonstrate that when viewing the evidence in the light most favorable to Plaintiff, the case presents no genuine issue of material fact, and that reasonable minds could come to but one conclusion in favor of the Defendant.  Defendant fails to meet this burden.  Plaintiff presented ample evidence that he met and often exceeded Defendant's performance expectations throughout his

18

Case No. 1:05-CV-2872
Gwin, J.

tenure as Managing Partner of the Northern Ohio office.  Although Defendant offered evidence that the office's production declined under Plaintiff's leadership, given the substantial evidence raised by Plaintiff, reasonable minds could determine that Defendant's proffered business justification for terminating Plaintiff's employment was a pretext for discrimination.  As the Court must view the evidence in the light most favorable to the nonmoving party, Defendant has failed to demonstrate that the case presents no genuine issue of material fact.

While the jury was not required to find the Defendant's justification was pretextual, it had more than sufficient evidence to support such a finding.  Plaintiff has convincingly demonstrated that reasonable jurors could have found Plaintiff's proffered business justification for Plaintiff's discharge was a pretext for discriminatory age animus.  As such, the Court denies Defendant's Motion for Judgment as a Matter of Law with regard to Plaintiff's claim of age discrimination.

3 .  Statements Evincing Age Bias

In addition to this circumstantial evidence that Defendant New York Life discriminated against Morgan on the basis of his age, the Plaintiff offered direct evidence that the Plaintiff said established a discriminatory motive for his firing.  At trial, the Plaintiff offers evidence of numerous allegedly ageist comments made by Senior Vice President of Agency Paul Morris.[3/]  In addition, on

---

[3/] Plaintiff offers evidence that Morris wrote or testified to the following:
- "We need to bring young people like this through our system . . ."  Pl. Ex. 168-041;
- "these two young men have a great deal to offer in the agency . . ." Pl. Ex. 168-041;
- "I am getting very positive feedback about the young management style . . ." Pl. Ex. 198-023; and
- "I think it would stand to reason that we hire 65, probably not going to work as long in the workplace as a 21-year-old.  So we have to have a balance of ages."  Trial Tr. 410.

Case No. 1:05-CV-2872
Gwin, J.

September 24, 2001, when discussing another older Managing Partner Jim Torrell who was

allegedly forced to retire, Morris wrote,

> His last three years have by far been the best of his career and at the age of 64, he is
> still exuberant about the life insurance industry.  As I have told you many times, Jim
> is a manager from the past.  I have remained a big supporter of his but also recognize
> that he is not a manager for the future.  Change has been so rapid in our industry that
> time has passed Jim by.

Pl. Ex. 92.  Morris also praised Willson in an unrelated performance review stating, "Showed

leadership and handled a difficult situation in Tampa helping MP Bartlett come to a retirement

decision that is good for him and the future of the General Office."  Pl. Ex. 84.

Furthermore, at trial South Central Zone's Chief Operating Officer Bob O'Neill agreed to

the question, "And you're aware that – that the performance reviews are littered with age-related

references?"  Trial Tr. 747-48.  Finally, on August 31, 2005, approximately three weeks prior to

Plaintiff's termination, Executive Vice President Hildebrand issued a company-wide email with the

subject heading, "A New Generation of Agency Field Management Leaders."  Therein, Hildebrand

described changes that "will enable [Defendant] to tap into a new generation of managerial talent."

Pl. Ex. 12.

Initially, Defendant claims that statements by Morris and Hildebrand are irrelevant because

they played no role in the decision to terminate Plaintiff's employment.  On the contrary, although

Morris denied his role in the decision-making process in discovery, Morris later admitted at trial that

in his capacity as Senior Vice President of Agency he was responsible for making the ultimate

decision to terminate Plaintiff's employment.  Likewise, when Fred Eisner, former president of

Defendant's Agents Advisory Council, approached Defendant's Chief Executive Officer to inquire

20

Case No. 1:05-CV-2872
Gwin, J.

about Plaintiff's termination, the Chief Executive told Eisner to speak with Morris.

South Central Zone Senior Vice President Brad Willson also testified that during a plane ride in the fall of 2005, he engaged in a conversation regarding Plaintiff's employment status with Morris and Hildebrand.  As a result of this conversation, Willson testified that he understood that Morris was going to speak with other members of management about terminating Plaintiff's employment.  Trial Tr. 431-32.  O'Neill also testified that he believed Willson had discussed Plaintiff's termination with Morris.  Trial Tr. 291.  Finally, O'Neill testified that Hildebrand had participated in discussions concerning Plaintiff's employment status and potential termination as early as August 2004.  Trial Tr. 291-94.  As such, Plaintiff has presented substantial evidence that Morris and Hildebrand were both substantially involved in the decision to terminate his employment.  Therefore, their statements are relevant as direct evidence of alleged age discrimination.

Defendant argues that "in order for age-related comments to support a finding of intentional discrimination, there must be some connection between the discriminatory comments and the adverse employment decision."  *Leonard v. Towers*, 6 Fed. Appx. 223, 229 (6th Cir. 2001).  The Sixth Circuit has determined, however, that "remarks by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, were relevant."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354-55 (6th Cir. 1998).  Likewise, "[a]lthough we believe a direct nexus between the allegedly discriminatory remarks and the challenged employment action affects the remark's probative value, the absence of a direct nexus does not necessarily render a

21

Case No. 1:05-CV-2872
Gwin, J.

discriminatory remark irrelevant." *Id.* at 355.

> The Sixth Circuit has also held:

> when assessing the relevancy of an allegedly biased remark where the plaintiff presents evidence of multiple discriminatory remarks or other evidence of pretext, we do not view each discriminatory remark in isolation, but are mindful that the remarks buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus.

*Id.* at 356.  Similarly, "[d]iscriminatory statements may reflect a cumulative managerial attitude among the defendant-employer's managers that has influenced the decisionmaking process for a considerable time. Thus, management's consideration of an impermissible factor in one context may support the inference that the impermissible factor entered into the decisionmaking process in another context.  *Id.*  "This is especially true when the discriminatory statement is 'not an off-hand comment by a low-level supervisor' but a remark by a senior official evidencing managerial policy."  *Id.*

Finally, in arguing that Plaintiff Morgan offered insufficient evidence to the jury, Defendant New York Life argues that some of the statements cited by Plaintiff were too remote in time to support the jury's finding that New York Life discriminated against Thompson on account of his age.  The Sixth Circuit, however, considered comments made more than a decade prior to an employment decision in a case relied heavily upon by Defendant.  "Although those two quoted comments were not made in the context of Cooley's termination, and they had been made a long time before he was dismissed, they do help to reveal [employer's] state of mind and reflect a deep-rooted, ongoing pattern that is anything but isolated."  *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1331 (6th Cir. 1994).  In the instant case, each comment cited by Plaintiff was made during

22

Case No. 1:05-CV-2872
Gwin, J.

Plaintiff's five-year tenure as Managing Partner of the Northern Ohio office.  These comments give some support for Plaintiff's contention that Defendant engaged in a pattern and practice of discriminating against older employees.  While Defendant New York Life can argue that any such comments should not be given much weight, the jury found against it.  Having lost to the jury, it is not this Court's providence to re-weigh sufficient evidence.

In sum, Plaintiff has offered numerous allegedly ageist comments made by four of Defendant's highest ranking members of management, each of whom played some role in deciding to terminate Plaintiff's employment.  These comments establish a genuine issue of material fact as to whether Defendant discriminated against Plaintiff on the basis of his age when choosing to terminate his employment with the company.  Also, the jury received other significant circumstantial evidence that New York Life intentionally discriminated against Morgan on account of his age.  This direct evidence of discrimination received only a small emphasis at trial.  On the basis of the evidence presented, reasonable fact-finders could come to differing conclusions as to whether Defendant's comments were purely innocuous or illustrative of an age animus that improperly motivated Plaintiff's discharge.  As such, Defendant has failed to meet its burden of showing no sufficient evidence to raise a material issue of fact for the jury.

B.      *Punitive Damages*

Defendant also contends that it is entitled to judgment as a matter of law on Plaintiff's claim for punitive damages.  Defendant offers two arguments in support of its motion: (1) Plaintiff failed to show sufficient evidence of actual malice by clear and convincing evidence; and (2) Plaintiff's

23

Case No. 1:05-CV-2872
Gwin, J.

punitive damages award was unconstitutional.  The Court rejects each of these arguments.

1.  Actual Malice

Plaintiff Morgan made his claims under Ohio state law.  Under Ohio law, punitive damages may be awarded upon a showing of clear and convincing evidence that Defendant acted with "actual malice."  *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St. 3d 638, 652 (1994).  Actual malice is "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."  *Preston v. Murty*, 32 Ohio St. 3d 334, syllabus (1987). The Supreme Court has determined that the term "malice" pertains "to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination."  *Kolstad v. Am. Dental Ass'n*, 527 U.S. 535 (1999).  Finally, "actual malice may be inferred from conduct and surrounding circumstances."  *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St. 3d 272, 277 (1983).

In the instant case, the Court finds that Plaintiff has shown clear and convincing evidence that Defendant acted with a conscious disregard for his rights, and that this conscious disregard had a great probability of causing substantial harm.  Above and beyond establishing a genuine issue of material fact, Plaintiff offers a plethora of direct and indirect evidence substantiating his claim that Defendant willfully disregarded his right to be free from the discriminatory actions of his employer taken on the basis of Plaintiff's age.

Notably, Plaintiff offered evidence that each of Defendant's four decision-makers in the instant case began engaging in conversations concerning his employment status and potential

24

Case No. 1:05-CV-2872
Gwin, J.

termination as early as August 2004.  Rather than placing Plaintiff on a less-serious "performance alert," Defendant skipped this usual cautionary phase and placed Plaintiff directly on "performance warning" when his GPA allegedly met, but did not fall below the company's benchmark of 1.50. In any case, Defendant admits that Plaintiff's actual GPA never dipped below 1.71; yet, Defendant refused to correct its mistake in the company's records even after Plaintiff notified Defendant of its error.  Similarly, Defendant mistakenly understated Plaintiff's performance by employing a four-year history to calculate Plaintiff's combined annual growth rate instead of the traditional five-year history, thus depriving Plaintiff of any credit for the substantial growth that occurred during his first year of leadership and also increasing the benchmark against which future growth would be measured.

Regardless of its own errors, Defendant maintains that its role in administering the performance program system is akin to "being an umpire in a ball game, and whether you miss it by this much or a foot, it's still a strike, and you know, you got to call it as it is."  Trial Tr. 475-77. As such, Defendant found it acceptable to overlook extenuating circumstances such as losing one of the nation's top-producing agents to disability and having an employee embezzle millions of dollars from the citizens of northern Ohio.  When assessing the economic conditions in northern Ohio during Plaintiff's tenure as Managing Partner, Fred Eisner, former president of Defendant's Agents Advisory Council candidly informed Morris that "God couldn't have made the numbers." Trial Tr. 83.  In spite of these obstacles, Defendant allegedly chose to terminate the employment of a twenty-year, "true blue" "company man" because he failed to meet one of six performance targets by one agent as a result of a technicality that was discovered months after the fact.  Trial Tr. 291.

25

Case No. 1:05-CV-2872
Gwin, J.

In contrast, Plaintiff offers evidence of at least five similarly-situated younger employees, including Plaintiff's own replacement, who according to Defendant's records performed worse than Plaintiff, but were not disciplined as harshly, and in some cases were even promoted.  *See supra* Part III.A.1.   Finally, Plaintiff presents evidence of a company record that even Defendant admits is "littered with age-related references."  Trial Tr. 747-48.  *See supra* Part III.A.3

The probability of causing substantial harm generated by Defendant's actions was both great and readily apparent.  Plaintiff's annual income exceeded, often substantially, $500,000 each year that he served as Managing Partner of the Northern Ohio office.  In addition, Plaintiff offered evidence that if he had been permitted to work for Defendant for an additional 3.5 years, his pension plan would have become fully vested resulting in an additional $125,000 of annual retirement benefits .  The four decision-makers in the instant case are top executives of a multi-billion dollar company whose job consists in part of compiling tremendous minutia in order to make profitable decisions regarding employee retention.  As such, the Court finds that Plaintiff has shown sufficient evidence to support the jury's finding of "actual malice" to justify the punitive damages.

2.  Unconstitutionality of the Punitive Damages Award

The Supreme Court has enumerated three factors the Court must consider when determining whether a punitive damages award is constitutional: (1) the degree of reprehensibility of Defendant's conduct; (2) the proportional relationship between the compensatory harm and the punitive damages award; and (3) the nature of available civil penalties and comparable awards.  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996).   In the instant case, the jury awarded $6,000,000 in compensatory damages and $10,000,000 in punitive damages, a ratio of 1.67:1.  The Court rejects

Case No. 1:05-CV-2872
Gwin, J.

Defendant's contention that this punitive damages award is unconstitutional.

The Court has already recounted the voluminous evidence presented by Plaintiff that established not only a genuine issue of material fact as to whether Defendant discriminated against Plaintiff on the basis of his age, but also clear and convincing evidence that Defendant exhibited a conscious disregard for Plaintiff's rights, thereby generating a great probability of causing substantial harm.  *See supra* Part III.A.; III.B.1.  For all the aforementioned reasons, the Court accords a high degree of reprehensibility to Defendant's actions.

The Court also finds that the ratio between the compensatory and punitive damage awards is reasonable and comports with due process.  In *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991), the Supreme Court "concluded that even though a punitive damages award of 'more than 4 times the amount of compensatory damages' might be 'close to the line,' it did not 'cross the line into the area of constitutional impropriety.'" *Gore*, 517 U.S. at 581-82 (quoting *Haslip*, 499 U.S. at 24).  In *Gore*, the Supreme Court determined that a ratio of 500:1 was grossly excessive.  The *Gore* Court, however, also provided some historical context, citing "[s]ome 65 different enactments during the period between 1275 and 1753 [that] provided for double, treble, or quadruple damages." *Id.* at 581.

Providing further guidance, the Supreme Court stated in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003), "Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Conversely, "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals

27

Case No. 1:05-CV-2872
Gwin, J.

of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . or, in this case, of 145 to 1." *Id.*

In the instant case, the 1.67:1 ratio between punitive and compensatory damages falls well within the "single-digit" multiplier endorsed by the *State Farm* Court, as well as the 4:1 ratio upheld in *Haslip*. Regardless, Defendant emphasizes that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425. Yet, the *State Farm* Court also cautioned that "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.*

Although a punitive damages award of $10,000,00 is unquestionably substantial, given the fact that Plaintiff's annual income often approached $1,000,000, the punitive damages award is neither grossly excessive nor shocking to the conscience.

Defendant emphasizes that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Gore*, 517 U.S. at 574. Examination of the precise circumstances surrounding Defendant's actions in the instant case illustrates that the four decision-makers consciously disregarded Plaintiff's rights with full knowledge that the economic impact of their actions would be devastating. Not only was Plaintiff earning between $500,000 and $1,000,000 annually, but his pension also would have fully vested within 3.5 years had he remained employed by Defendant. Instead, Plaintiff presented ample evidence that while he devoted the past twenty years of his life in service to his company, he was

28

Case No. 1:05-CV-2872
Gwin, J.

harshly repaid with termination of his employment during the golden years of his career as a result of age animus harbored by Defendant.

Defendant also notes that "the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties." *Philip Morris USA v. Williams*, 127 S. Ct. 1057, 1063 (2007). This argument ignores the fact that the vast majority of evidence presented by Plaintiff at trial addressed Defendant's specific treatment of Plaintiff in comparison to similarly-situated younger managing partners in the company. Although Plaintiff made reference to the circumstances of other managing partners who were members of the protected class, such references were minor and Defendant fails to demonstrate any impact of such references that would render the punitive damages award constitutionally infirm. The punitive damages awarded in the instant case are reasonable on the basis of Defendant's conduct towards Plaintiff alone.

Finally, with regard to the nature of available civil penalties and comparable awards, Defendant urges the Court to consider the disparity between the $10,000,000 awarded in the instant case and the following penalties levied by Ohio's Insurance Superintendent: (1) issuing racially discriminatory insurance premiums pursuant to O.R.C. §§ 3911.99(A), 3911.17 (maximum $200); (2) misconduct by a licensed insurance agent pursuant to O.R.C. § 3905.14(D)(1) (maximum $25,000); and (3) catch-all violations of insurance law pursuant to O.R.C. § 3901.99(B) (maximum $25,000). The Court finds that these "most analogous civil penalties" offered by Defendant are actually not analogous at all.

Initially, the Court notes that Defendant provides virtually no argument as to how the

29

Case No. 1:05-CV-2872
Gwin, J.

issuance of racially discriminatory insurance premiums; misconduct by licensed insurance agents;

or catch-all violations of insurance law are related to the discriminatory discharge of a senior

executive of an insurance company resulting from age animus harbored by his employer.  The third

prong of analysis posited in *Gore* does not require the Court to grasp for remotely similar civil

remedies  In the instant case, Defendant has provided no justification why the punitive damages

award should be somehow constrained by its relation to civil remedies that merely contain the words

"discrimination" or "insurance."  As such, upon consideration of the three factors established by the

Supreme Court in *Gore*, the Court finds that the punitive damages award in the instant case is not

unconstitutional.  Therefore, the Court denies Defendant's Motion for Judgment as a Matter of Law

on these grounds.

### III.  Analysis of Motion for New Trial, or in the alternative, for Remittitur

Defendant's Motion for New Trial, or in the alternative, for Remittitur contains five primary

contentions: (1) the judgment is contrary to the clear weight of the evidence and is contrary to law;

(2) Defendant was denied a fair trial by certain evidentiary rulings and the failure to give clarifying

jury instructions; (3) the punitive damages award is against the weight of the evidence, is excessive

in amount, and was influenced by passion and prejudice; (4) Plaintiff's counsel's used vitriol in

closing argument that inflamed the jury, resulting in a verdict that was the result of passion and

prejudice; and (5) Defendant is entitled to remittitur of back wages awarded to Plaintiff.  The Court

rejects each of these arguments.

A.      *Judgment Contrary to the Weight of the Evidence*

In this sub-ground, Defendant renews arguments initially posited in its Motion for Judgment

30

Case No. 1:05-CV-2872
Gwin, J.

as a Matter of Law.  Specifically, Defendant contends that the jury's verdict with regard to both

liability and punitive damages was contrary to the manifest weight of the evidence.  The Court has

already addressed these arguments in detail in Part III of this opinion.  As such, the Court finds that

Defendant has failed to meet its burden in demonstrating that the jury has reached a seriously

erroneous verdict.  Instead, after comparing the opposing proofs and weighing the evidence, the

Court finds that the jury's verdicts with regard to both liability and punitive damages could be

reasonably reached and do not warrant a new trial.  *See J.C. Wyckoff, 936 F.2d at 1487*; *Wayne, 36*

*F.3d at 525*.

**B.**     *Evidentiary Rulings and Jury Instructions*

        Next, Defendant argues that a new trial is warranted on the basis of the admission of stale,

irrelevant and prejudicial statements by Hildebrand, Morris, Willson and O'Neill.  Essentially,

Defendant argues that virtually no statement made by Defendant's representatives was properly

admitted at trial because the statements either were not made by persons who decided to terminate

Plaintiff, were not made in the context of the decision to terminate Plaintiff, were too remote in time

from the decision to terminate Plaintiff, or were too abstract or ambiguous to be probative of age

discrimination.

        Initially, Plaintiff properly notes, "A motion for a new trial will not be granted unless the

moving party suffered prejudice. . . . Even if a mistake has been made regarding the admission or

exclusion of evidence, a new trial will not be granted unless the evidence would have caused a

different outcome at trial."  *Barnes v. City of Cincinnati, 401 F.3d 729, 743 (6th Cir. 2005)*.  In the

instant case, Plaintiff's primary evidence of discrimination is Defendant's disparate treatment of

Case No. 1:05-CV-2872
Gwin, J.

Plaintiff in comparison to a similarly-situated younger employee, Mostafa Abdou.  Plaintiff presented substantial evidence that Defendant fired him and replaced him with substantially younger Abdou though Abdou enjoyed a worse record managing a smaller office in a higher growth area and that younger managing partners consistently received leniency and pardoned for periods of poor performance, whereas Defendant rigidly held Plaintiff to higher performance standards.  *See supra Part III*.

Defendant skipped the "performance alert" stage of its Performance Improvement Program and placed Plaintiff on "performance warning" when it erroneously determined that his GPA had met, but not dropped below the company benchmark of 1.50.  Rather than correcting its error when Plaintiff notified it, Defendant refused and continued to subject Plaintiff to disparate treatment by employing a four-year history instead of the traditional five-year history when evaluating his CAGR.  In light of the ample evidence that Defendant's proffered business justification for terminating Plaintiff's employment was merely a pretext for discrimination, Defendant has failed to demonstrate that exclusion of Defendant's ageist statements "would have caused a different outcome at trial." *Id*.

Additionally, the Court has already rejected Defendant's argument that Morris and Hildebrand played no role in the decision to terminate Plaintiff's employment.  *See supra Part III*.A3.  Morris, himself, admitted at trial that he was responsible for making the ultimate decision to terminate Plaintiff's employment.  Likewise, Plaintiff presented ample evidence that both Morris and Hildebrand, along with Willson and O'Neill, were intimately familiar with Plaintiff's employment status and collectively determined that he should be discharged.

32

Case No. 1:05-CV-2872
Gwin, J.

Furthermore, as noted *supra* Part III.A.2, the Sixth Circuit has specifically held that when evaluating remarks by senior officials evincing managerial policy, "[d]iscriminatory statements may reflect a cumulative managerial attitude among the defendant-employer's managers that has influenced the decisionmaking process for a considerable time. Thus, management's consideration of an impermissible factor in one context may support the inference that the impermissible factor entered into the decisionmaking process in another context." *Ercegovich*, 154 F.3d at 356.  For all of the reasons delineated *supra* Part III.A.2, the Court finds that the statements offered by Plaintiff were admissible as probative evidence of a pattern and practice of discrimination adopted by Defendant.

Second, Defendant cites several cases in support of its contention that evidence regarding Defendant's termination of Torell should have been excluded as irrelevant.  Each of these cases is readily distinguishable from the present matter.  In both *Schrand v. Fed. Pac. Elec. Co.*, 851 F.2d 152, 156 (6th Cir. 1988) and *Boyle v. Mannesmann Demag Corp.*, 1993 U.S. App. LEXIS 8682, *7 (6th Cir. 1993), appellate courts found that discriminatory statements attributed to defendant employers should have been excluded as irrelevant because the statements were made by individuals who were not responsible for the decision to terminate the plaintiffs.  As a result, the *Schrand* Court found a lack of "evidence from which the alleged statements of the witnesses could logically or reasonably be tied to the decision to terminate Schrand.  This is especially so in light of the fact that Schrand has expressly stated that he was not attempting to establish a pattern and practice case." 851 F.2d at 156.  Defendant also cites *Byrnes v. LCI Commc'n Holdings Co.*, 77 Ohio St. 3d 125, 129 (1996), in which both plaintiffs failed to establish a *prima facie* case because neither "was

33

Case No. 1:05-CV-2872
Gwin, J.

replaced by a person outside the statutorily protected class."

In the instant case, the letter recommending the termination of Torell's employment because "he is not a manager for the future" and "time has passed him by" was written by Morris and addressed to Hildebrand, two of the four decision-makers directly responsible for the termination of Plaintiff's employment.  Unlike *Schrand*, Plaintiff has explicitly argued that Defendant engaged in a "pattern and practice of discriminating against older individuals with respect to discipline, termination, hiring opportunities, promotion opportunities, benefits, and other terms and conditions of employment."  Am. Compl. ¶ 14.  Finally, as explained *supra* Part I, Plaintiff successfully establishes a *prima facie* case because he was a member of a statutorily protected class who was arguably qualified for his position, terminated by his employer and replaced by a person who is not a member of the protected class.

Third, Defendant argues that a new trial is warranted on the basis that the Court refused to give a proposed jury instruction stating that if age-related remarks are "ambiguous, not close in time or related to the employment decision, and not made by the decision maker, then you should not rely on them as proof of age discrimination."  Defendant argues that failure to instruct the jury in this manner further aggravated the Court's erroneous admissibility rulings.

Defendant offers no authority whatsoever in support of its argument that such an instruction was required, let alone sufficient evidence that the Court's refusal to instruct the jury in this manner produced a "seriously erroneous result."  *See Holmes*, 78 F.3d at 1046.  Defendant's lone citation refers, once again, to a case in which comments attributed to an employer were excluded because, unlike the instant matter,  they were made by an individual totally unrelated to the decision-making

Case No. 1:05-CV-2872
Gwin, J.

process generating plaintiff's discharge.  *See Covington v. MCI Worldcom Network Servs.*, 93 Fed. Appx. 837 (6th Cir. 2004).  As such, the Court finds that the jury's verdict in the instant case was not seriously erroneous.  Likewise, Defendant has failed to demonstrate substantial prejudice resulting from the Court's evidentiary rulings or jury instructions sufficient to change the outcome of the trial.

C.      *Punitive Damages*

        In this sub-ground, Defendant also renews arguments initially posited in its Motion for Judgment as a Matter of Law.  Specifically, Defendant asserts that the punitive damages award stands against the weight of the evidence and is excessive in amount.  The Court has previously analyzed these arguments in great detail and rejected Defendant's contentions.  *See supra* Part III.B.

        In addition, Defendant raises one new argument that the Court should grant a new trial because the punitive damages award is so disproportionately excessive "as to patently indicate passion or prejudice."  *Minarik v. Nagy*, 8 Ohio App. 2d 194, 197 (1963).  Given the 1.67:1 ratio between the punitive damages and compensatory damages awards and the fact that Defendant's conduct was highly reprehensible, the Court finds that the jury award is not so excessive as to patently indicate passion or prejudice.  Rather, for all the aforementioned reasons in Part III.B., the Court finds that the $10,000,000 punitive damages award is reasonable given the circumstances of the instant case.

D.      *Vitriol During Closing Argument*

        In its final sub-ground offered to justify the grant of a new trial, Defendant argues that Plaintiff's counsel's employment of vitriol in closing argument inflamed the jury, producing an

35

Case No. 1:05-CV-2872
Gwin, J.

unfair verdict based on passion and prejudice.  Specifically, Defendant cites Plaintiff's counsel's

description of Defendant's representatives in closing argument as racists, bigots and hyenas, as well

as his reference to Defendant's Madison Avenue offices.  Defendant also claims that Plaintiff's

discussion of Defendant's alleged refusal to transfer a black manager to Utah because the company

believed that a black man would not succeed in a predominately white community was vitriolic.

"Statements made during closing argument must be plainly unwarranted and clearly injurious

to constitute reversible error." *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 644 (7th Cir. 1995);

*see also McGhee v. Yukins*, 229 F.3d 506, 513 (6th Cir. 2000).  Yet, "neither trial tactics nor mere

temerity will excuse counsel's failure to object to a remark made in closing argument." *Doe By &*

*Through G.S. v. Johnson*, 52 F.3d 1448, 1465 (7th Cir. 1995).

In the instant case, Defendant waived any objection to Plaintiff's counsel's closing remarks

by failing to object at trial and failing to request a curative instruction.  Regardless, this entire case

revolves around Defendant's allegedly discriminatory termination of Plaintiff's employment as a

result of his age and race.  As such, descriptions of Defendant's representatives as racists, bigots or

"a bunch of discriminators" merely echo the central thrust of Plaintiff's causes of action.  The Court

does not find such terminology so flagrant as to infect the jury with passion and prejudice or create

a substantial likelihood that the jury was somehow misled.

Similarly, Defendant's alleged decision to prevent transfer of a black employee to Utah

because of its belief that a black man could not succeed in a predominately white neighborhood is

more probative than prejudicial as to whether Defendant engaged in a pattern and practice of

discriminatory treatment of its employees.  In any case, the jury rejected Plaintiff's claim of race

36

Case No. 1:05-CV-2872
Gwin, J.

discrimination.  As such, Defendant has failed to demonstrate any harm resulting from this comment.

When further highlighting Defendant's alleged racial discrimination, Plaintiff's counsel stated, "You saw in the course of this trial . . . a company having a meeting on Madison Avenue in which they specifically ask for action plans from each general office to mirror their market, and then they identify Northern Ohio as an ethnic market."  Trial Tr. 837.  The Court finds this minor, offhand reference to Defendant's overall worth to be innocuous.

Finally, when describing Defendant's discriminatory intent and disparate treatment of Plaintiff, Plaintiff's counsel stated:

> Now, you'll recall the GPA, 1.5 downward trends. They picked the reason, the moment -- the moment his GPA through a mistake dips to 1.5, they're like hyenas on that man.  They are after him. They want him out because they see opportunity here. He's got 100 percent of the office. He's older. It's a premier office. It's in an ethnic community, and they want him out.

Trial Tr. 843.  Whereas the comparison of Defendant's decision-makers to hyenas is remotely inflammatory, upon examination of the totality of the circumstances (including the nature of counsel's comments, their frequency, their relevancy to issues to be decided by the jury, and the strength of Plaintiff's case), the Court finds that the comment in no way misled the jury and was not so flagrant as to infect the jury with passion and prejudice sufficient to render their verdict constitutionally infirm.  As such, the Court denies Defendant's Motion for New Trial.

E.      *Motion for Remittitur*

Finally, in the alternative, Defendant argues that it is entitled to remittitur of $350,000 as a result of the jury's award of $1,000,000 in past economic compensatory damages.  Defendant

37

Case No. 1:05-CV-2872
Gwin, J.

describes the past economic compensatory damages award as an "evidentiary mystery," suggesting

that at most Plaintiff has proven a back pay figure of $650,000.  Defendant also claims that even

Plaintiff's expert, John Burke, determined that the back pay owed should be far less than the

$1,000,000 awarded by the jury.

      The Sixth Circuit "has determined a jury verdict should not be remitted by a court 'unless

it is beyond the maximum damages that the jury reasonably could find to be compensatory for a

party's loss.'" *Gregroy v. Shelby County*, 220 F.3d 433, 443 (6th Cir. 2000) (citation omitted).

Remittitur is permitted "only when, after reviewing all evidence in the light most favorable to the

awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice;

or is so excessive or inadequate as to shock the judicial conscience of the court." *Id.*

      Contrary to Defendant's assertion, Burke testified that Plaintiff's past economic losses as of

that time were "a little less than $1 million."  Trial Tr. 342.  Burke explained in detail the process

by which he arrived at this figure and testified that his conclusions were accurate to a reasonable

degree of economic certainty.  Trial Tr. 340-42.  No evidentiary mystery is present in the instant

case.  The jury adopted the figure derived from the calculations of Plaintiff's expert.  After

reviewing all evidence in the light most favorable to the Plaintiff, the Court finds that the past

economic compensatory damages award did not exceed "the maximum damages that the jury

reasonably could find to be compensatory" for Plaintiff's loss.  *Gregory*, 220 F.3d at 443.  As such,

the Court denies Plaintiff's Motion for Remittitur.

## V.  Conclusion

      For all the aforementioned reasons, the Court hereby **DENIES** Defendant's Motion for

Case No. 1:05-CV-2872
Gwin, J.

Judgment as a Matter of Law, Motion for New Trial and Motion for Remittitur.

     IT IS SO ORDERED.


Dated: August 16, 2007                    s/       *James S. Gwin*       
                                                  JAMES S. GWIN
                                                  UNITED STATES DISTRICT JUDGE